KESSNER UMEBAYASHI BAIN & MATSUNAGA
Attorneys at Law, A Law Corporation

MICHELE-LYNN E. LUKE     5332-0
SAORI TAKAHASHI          8834-0
BRADFORD K. CHUN         9426-0
220 South King Street, Suite 1900
Honolulu, Hawaii  96813
Telephone:  (808) 536-1900
Facsimile:   (808) 529-7177
Email: mluke@kdubm.com

Attorneys for Plaintiff
TIMOTHY J. CISLO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| TIMOTHY J. CISLO ) <br><br> Plaintiff, ) <br><br> vs. ) <br><br> FORD N. FUCHIGAMI, in his official ) capacities as Director, DOT, State of ) Hawai`i and as former Deputy Director, ) DOT-A, State of Hawai`i; ROSS M. ) HIGASHI, in his official capacities as ) Deputy Director - DOT-A, State of ) Hawai`i and in his former capacities for ) DOT-A, State of Hawai`i; ROY ) SAKATA, in his official capacity as ) the Airport District Manager for the ) Oahu District Office of DOT-A, State ) of Hawai`i and in his former official ) capacities for DOT-A, State of ) | CIVIL NO. _____ <br> (Other Non Vehicle Tort) <br><br> **COMPLAINT FOR DAMAGES** <br> **AND FOR INJUNCTIVE RELIEF**; <br> **DEMAND FOR JURY** |

Hawai`i; ABIGAIL LAREAU, in her )
official capacities for DOT-A for the )
State of Hawaii, Property Management )
Section; and DEPARTMENT OF )
TRANSPORTATION - AIRPORTS )
DIVISION, STATE OF HAWAII )
                                              )
                   Defendants.          )
_____ )

## COMPLAINT FOR DAMAGES AND FOR INJUNCTIVE RELIEF

Plaintiff TIMOTHY J. CISLO ("Plaintiff"), by and through his undersigned attorneys, and for his complaint against Defendant named herein, alleges and avers as follows:

### The Parties

1.       Plaintiff is, and at all time relevant herein was, a resident of the City and County of Honolulu, State of Hawai`i, and at all time relevant herein has been a tenant of Defendant DOT-A engaged in non-commercial, general aviation activities at Kalaeloa Airport.

2.       Defendant FORD N. FUCHIGAMI (Defendant FUCHIGAMI) is currently the Director of the Department of Transportation (Director of DOT) for the State of Hawai`i and at all times relevant herein was either the Director of DOT, the Deputy Director for the DOT's Airports Division of the State of Hawai`i or the Acting Deputy Director for the DOT's Airports Division of the State of

2

Hawai`i.  DEFENDANT FUCHIGAMI is being sued herein in his official capacities, stated above.

3.     Defendant ROSS M. HIGASHI (Defendant HIGASHI) is currently the Deputy Director for the DOT for the State of Hawai`i's Airports Division (Director of DOT-A) and at all times relevant herein was either the Director of DOT-A or otherwise employed by DOT-A for the State of Hawai`i.  Defendant HIGASHI is being sued herein in his official capacities, stated above.

4.     Defendant ROY SAKATA (Defendant SAKATA) is currently the Airport District Manager for the Oahu District Office of DOT-A for the State of Hawai`i (ADM-Oahu) and at all times relevant herein was either the ADM-Oahu or otherwise employed by DOT-A for the State of Hawai`i.  Defendant SAKATA is being sued herein in his office capacities, stated above.

5.     Defendant ABIGAIL LAREAU (Defendant LAREAU) is, and at all times relevant herein was, employed by DOT-A, State of Hawai`i's Property Management Section.  Defendant LAREAU is being sued herein in her official capacity, stated above.

6.     Defendant DEPARTMENT OF TRANSPORTATION - AIRPORTS DIVISION ("Defendant DOT-A") is an agency of the State of Hawai`i, tasked with the construction, maintenance operation and management of all State of

3

Hawai`i airport facilities, and in furtherance of that mandate, tasked to coordinate its operations in compliance with related federal programs, including public benefit conveyance, airport improvement and grant assurance programs administered by the Federal Aviation Administration (FAA) of the U.S. Department of Transportation.

### Jurisdiction & Venue

7.      This Court has subject matter jurisdiction over the claims for relief asserted in this action, pursuant to 28 U.S.C. §§1331, 1343, 2201 and 2202; and pursuant to 42 U.S.C. §1983.  Further, this Court holds supplemental jurisdiction over all state law claims asserted in this action, arising from the same case or controversy as giving rise to Plaintiff's federal law claims, pursuant to the provisions of 28 U.S.C. §1367.

8.      Venue resides with the United States District Court for the District of Hawaii, pursuant to 28 U.S.C. §1391(b), as all events described herein and which are the subject of Plaintiff's claims, occurred within the State of Hawai`i.

### Overview

9.      Through a series of agreements and instruments with the U.S. Department of Defense and the U.S. Department of Transportation , the State of Hawai`i was conveyed surplus lands located at the former Barbers Point Naval Air

4

Station (BPNAS), including John Rodgers Airfield, by the U.S. Department of Defense.

10.     The conveyance of John Rodgers airfield was made to Defendant DOT-A as a public benefit conveyance (PBC), as recognized under federal law, and as a consequence of the federal government's specific recognition of a substantial public interest in the promotion and support of civil aviation activities within local communities.

11.     John Rodgers airfield, was conditionally conveyed to Defendant DOT-A pursuant to a quitclaim deed ("Quitclaim Deed"), whereby Defendant DOT-A was entrusted to operate and maintain the airport facility for all civil aviation users, inclusive of Plaintiff, and for purposes of "all aeronautical activities," on "reasonable terms" and without "unjust discrimination" ("covenants").

12.     By the terms of the Quitclaim Deed, as well as relevant provisions of the U.S. Code, civil aviation users, including Plaintiff, are intended beneficiaries of the PBC concerning John Rodgers airfield.

13.     By the terms of the Quitclaim Deed, as well as relevant provisions of the U.S. Code, the federal government has a right of reversion in the event Defendant DOT-A fails to satisfy the covenants identified above.

5

14. In exercising its right of reversion, the federal government has the legal right to repossession of the facility, at its option.

15. Defendant DOT-A is aware of its failure in satisfying its obligations under the terms of the Quitclaim Deed, through complaints and/or concerns raised by several members of the general aviation community; formal inquiries by members of the Hawai`i State Legislature; inquiries by national general aviation organizations such as the Aircraft Owners and Pilots Association (AOPA) and the Experimental Aircraft Association (EAA); and representatives of the Federal Aviation Administration (FAA). These complaints and/or concerns have been received by Defendant DOT-A spanning more than the last ten (10) years, and are ongoing.

16. Defendant DOT-A renamed the John Rodgers airfield, upon receipt of the PBC, Kalaeloa Airport.

17. Since the PBC, Defendant DOT-A has received substantial grant assurances from the federal government, for use at Kalaeloa Airport, which are also conditioned upon the operation and maintenance of the airport for all civil aviation users, under reasonable terms and without discrimination.

18. Defendant DOT-A has previously and publicly admitted its failure in satisfying its obligations, as described above, under the terms of the Quitclaim

Deed and the grant assurances.

19.    Defendant DOT-A is continuing to fail in meeting its obligations under the terms of the Quitclaim Deed and various grant assurances, as owed to civil aviation users, inclusive of Plaintiff.

20.    Defendant DOT-A has engaged in conduct directly contrary to general aviation (GA) interests and has unjustly discriminated against Plaintiff, in particular, concerning his prolonged efforts to secure a fair and reasonable non-commercial long-term lease as a civil aviation user, at Kalaeloa Airport.

21.    In lieu of a long-term lease, Defendant DOT-A issued a month-to-month Revocable Permit (RP) to Plaintiff, for the lease of an undeveloped 100' x 100' lot at Kalaeloa Airport, which was subsequently developed by Plaintiff and upon which Plaintiff constructed a private hangar, with utilities.

22.    The RP does not afford Plaintiff the guarantees and/or assurances which otherwise would have been provided by a non-commercial long-term lease, including realizing the benefit of Plaintiff's approximately $250,000 investment at Kalaeloa Airport and a guaranteed percentage limit of rental increases, over time.

23.    Since initially receiving an RP, Plaintiff has made continuing efforts to secure a non-commercial long-term lease from Defendant DOT-A for his leased lot, but Defendant DOT-A has refused to provide Plaintiff such a lease.

24. Defendant DOT-A's actions in refusing to generate and provide a non-commercial long-term lease to Plaintiff are arbitrary and discriminatory.

25. On August 28, 2017 a letter dated August 25, 2017 from Defendant DOT-A announcing its decision to increase the monthly lot rent charged to Plaintiff, from $491.00 to $2,683.33, an increase of over five hundred percent.

26. On August 28, 2017, Plaintiff received a letter dated August 25, 2017 from Defendant DOT-A announcing its decision to increase the monthly lot rent charged to Plaintiff for an additional small area rented by Plaintiff, from $193.67 to $292.21, an increase of approximately fifty percent.

27. Since receiving the August 25, 2017 letters from Defendant DOT-A, Plaintiff has repeatedly requested that Defendant DOT-A provide information, including appraisal documentation, upon which the new rates are purportedly based. Defendant DOT-A has not provided this information.

28. Since receiving the August 25, 2017 letters from Defendant DOT-A, Plaintiff has requested that Defendant DOT-A provide information concerning the identity of any other tenants whose lot rent has increases by the same magnitude as Plaintiff's lot. Defendant DOT-A has not provided this information.

29. Upon receiving the August 25, 2017 letters from Defendant DOT-A, Plaintiff requested an extension of time within which to assess his options under

8

the terms of the RP issued to him by Defendant DOT-A, due to the sudden financial hardship caused by Defendant DOT-A's rental rate increases. This request was denied by Defendant DOT-A.

30. Given the economic and personal strains imposed by the rental increases, Plaintiff has considered the sale of his hanger and improvements to other potential tenants, each of whom are commercial users, but was made aware that Defendant DOT-A will not allow such a sale.

31. Under current circumstances, and given Plaintiff's economic situation, Defendant DOT-A is forcing an abandonment of Plaintiff's hangar and improvements, to the sole benefit of Defendant DOT-A, and without any recourse short of court intervention.

32. Defendants FUCHIGAMI, HIGASHI, SAKATA and LAREAU have all engaged in conducted, acting under color of law, on behalf of Defendant DOT-A, to deprive Plaintiff of constitutional and other rights, as set forth below.

33. As a consequence of Defendant DOT-A's extensive course and pattern of conduct towards Plaintiff, Plaintiff has and will continue to be substantially harmed, for which Plaintiff now seeks damages as well as injunctive relief.

**Factual Allegations Relevant to Kalaeloa Airport**

34.    In 1993 the United States of America (U.S.), Department of Defense, designated Barber's Point Naval Air Station (BPNAS) a military installation to be closed, pursuant to the Base Realignment and Closure (BRAC) process.

35.    As part of the BRAC process, the U.S. Department of Defense notified the U.S. Department of Transportation, Federal Aviation Administration (FAA), of the availability of BPNAS' military airfield, John Rodgers airfield, for transfer as surplus land, to a local government entity or private party, without remuneration.

36.    As part of the BRAC process, the State of Hawai`i expressed interest in sponsoring conversion of the military airfield to a public airport and as a facility within the FAA's National Plan of Integrated Airport Systems (NPIAS). Contemporaneously, the State of Hawai`i also expressed interest in receiving other surplus lands from BPNAS, for other purposes.

37.    Inclusion of the airport as an NPIAS facility was required, to later qualify for federal grants administered by the FAA through its Airport Improvement Program (AIP), through which certain monies are specifically earmarked for improvement projects at former military airport installations, under the Military Airport Program (MAP).

10

38.   During all times relevant, the FAA's NPIAS categorized all airports into three major types consisting of commercial service airports, reliever airports and general aviation airports.

39.   As part of the BRAC process and in furtherance of meeting FAA's criteria for inclusion as an NPIAS facility, the State of Hawai`i was required to generate an airport master plan ("Plan") for the airport facility.

40.   The Plan required the State of Hawai`i to identify its current and 20-year projection of aeronautical needs of the geographic area to be served by the facility; identify the anticipated environmental impacts association with the use of the airport facility; and identify the facility's requirements and capital development needs.

41.   The State of Hawai`i was specifically required, within the Plan, to provide an operations and business plan demonstrating the extent to which the airport would be self-supporting; address communications and navigational aid needs for the civil airport; provide a multi-year capital development plan; and provide an airport layout plan (ALP).

42.   The State of Hawai`i received AIP funds for purposes of developing and completing its Plan.

43.   Defendant DOT-A has since received additional AIP funds, for use at

11

Kalaeloa Airport and for the designated benefit of general aviation improvements at that facility, with stated conditions.

44.     As part of the BRAC process involving BPNAS, approximately 1,055 acres of NPNAS land were retained by the U.S. Navy, approximately 457 acres of land were transferred to various federal agencies and approximately 2,180 acres were declared as surplus and therefore available for conveyance to State and local government agencies and/or private parties.

45.     In 1994, the Hawaii State Legislature created the BPNAS Redevelopment Commission (PBNAS-RC), which was charged with preparing a plan for the conveyance and reuse of surplus land being conveyed to the State of Hawai`i, pursuant to the BRAC process.

46.     In or about 1997, the State of Hawaii BPNAS Redevelopment Commission prepared and adopted the Naval Air Station Barbers Point Community Reuse Plan, also referred to as the Community Reuse Plan (CRP) or Reuse Plan, which identified certain State and County government agencies as the receiving entities of the surplus lands being conveyed from the U.S. Department of Defense pursuant to the BRAC process, and designating proposed uses for the surplus lands.

12

47. In July, 1998, BPNAS was formally closed as an active naval installation. By time of closure, approximately 2/3rds of the surplus lands identified at BPNAS had already been conveyed, pursuant to the BRAC process.

48. In or about 1998, the State of Hawai`i prepared and/or caused to be prepared, the Kalaeloa Airport Master Plan (KAMP).

49. In or about February, 1999, as part of the BRAC process, the U.S. Navy prepared and issued a Final Environmental Impact Statement (1999 FEIS), as required by the National Environmental Protection Agency (NEPA).

50. Contemporaneously, in or about February, 1999, Defendant DOT-A adopted Title 19 of Hawaii Administrative Rules, Subtitle 2 (Airports Division), Chapter 17.1 (Small Plane Hangar Units and Tie-Down Spaces at Public Airports), concerning the use of small plane hangars and tie-down spaces.

51. On July 1, 1999, Defendant DOT-A assumed control and operation of John Rodgers airfield, renamed Kalaeloa Airport, as a State-owned and operated facility. In addition to the airport facility, additional surplus lands formally associated with the BPNAS base, were conveyed to the State of Hawai`i for other uses.

52. Currently, Kalaeloa Airport consists of approximately 752 acres of surplus land conveyed to Defendant DOT-A by the U.S. Department of Defense,

13

as part of the BRAC process and pursuant to a "public benefit conveyance".

53. As a public benefit conveyance, Defendant DOT-A took title to Kalaeloa Airport subject to specific covenants that Defendant DOT-A operate the airport as a general aviation facility and as a reliever airport for Honolulu International Airport, consistent with the airport master plan previously submitted by the State of Hawai`i.

54. On accepting conveyance of John Rodgers airfield, Defendant DOT-A was aware of its continuing obligations under the conveyance documents, to operate and maintain the airfield, now Kalaeloa Airport, for the benefit of all civil aviation users within the general public, including both commercial and non-commercial (GA) users, in accord with the airport master plan ("covenants").

55. Defendant DOT-A was, and remains, aware that violation of these covenants confer a right by the federal government to reclaim the airport facility from Defendant DOT-A.

56. Upon conveyance of the property, Kalaeloa Airport was designated a general aviation airport and a reliever airport to Honolulu International Airport.

57. As of 1999, Defendant DOT-A understood and defined GA aircraft to include gliders, ultra-light aircraft, kit-built aircraft and single-engine piston aircraft. Defendant DOT-A further understood GA activities to include the

14

construction, operation, maintenance and repair of GA aircraft.

58.    In July, 2002, the Hawai`i State Legislature created the Kalaeloa Community Development District (KCCD), consisting of all lands on which BPNAS was previously sited, inclusive of lands retained by the U.S. Navy, lands conveyed to other federal agencies or lands designated as surplus lands being conveyed to the State of Hawai`i and/or other parties.

59.    In July, 2002, the Hawai`i State Legislature transferred redevelopment responsibility for KCDD from BPNAS-RC to the Hawaii Community Development Authority (HCDA).

60.    In 2006, the HCDA amended the 1997 CRP, by adoption of the Kalaeloa Master Plan (KMP), which incorporated a master airport plan.

61.    Upon completion of this transfer, HCDA assumed all responsibilities for management of the conveyed lands, including implementation of the CRP. Contemporaneously, HCDA's authority was expanded to include oversight of conveyed lands previously within the former BPNAS, including Kalaeloa Airport.

62.    The KMP submitted to the federal government, stated the State of Hawai`i would develop the facility for the benefit of GA and in furtherance of that mandate, would have in excess of 200 private GA hangars on site, by 2020.

63.    The KMP, developed for and on behalf of HCDA, was adopted on

15

March 1, 2006.  The KMP amended the prior redevelopment plan which had been prepared as part of the U.S. Department of Defense's BRAC process.

64.    At the time the KMP was issued, Kalaeloa Airport did not have necessary infrastructure to accommodate the construction of private GA hangers, for non-commercial use.

65.    Following issuance of the KMP, Defendant DOT-A was aware of its obligation to develop infrastructure to promote and facilitate the construction of private GA hangers, for non-commercial users.

66.    As a consequence of the KMP, Defendant DOT-A was aware that the existing water supply system was not sufficient to support the development and growth mandated by the KMP and that new water infrastructure compliant with the City and County of Honolulu, Board of Water Supply's standards, was required.

67.    As a consequence of the KMP, Defendant DOT-A was aware that the existing sewage system at Kalaeloa Airport was in a state of disrepair and was not compliant with applicable City and County of Honolulu standards.  Defendant DOT-A was also aware that a new sewage system was required to support the development and growth of GA, mandated by the KMP.

68.    As a consequence of the KMP, Defendant DOT-A was aware that the existing electrical system at Kalaeloa Airport was non-compliance with City and County of Honolulu electrical standards and would require substantial improvements and/or new construction, before Hawaiian Electric Company, Inc. (HECO) would assume operation of the system.

69.    Following issuance of the KMP, Defendant DOT-A was aware of the availability of federal grants to finance and/or subsidize necessary infrastructure work at Kalaeloa Airport, including funds generally available through the U.S. Department of Commerce's Economic Development Administration (EDA) and the Federal Aviation Administration's Military Airport Program.  Defendant DOT-A was also, as of this time, aware of the possibility of State-issued bonds, to assist in financing necessary infrastructure improvements at Kalaeloa Airport.

70.    Since 1999, Defendant DOT-A has received several millions of dollars in "grant assurance" funds, through the FAA, to be used for improvements at Kalaeloa Airport.  None of these funds were used to develop otherwise undeveloped open lots at Kalaeloa Airport, designated for non-commercial, private construction of hangar facilities.

71.    Grant assurance funds are conditional, the receipt of which requires Defendant DOT-A to make Kalaeloa Airport available to all civil aviation users on

reasonable terms and without unjust discrimination against any type of aeronautical activity or particular user.

72.     Receipt of grant assurance funds, pursuant to FAA regulation, requires Defendant DOT-A to account for various factors including: whether the property is being used for commercial or non-commercial use; whether the property was originally developed or undeveloped; the amount of the user's investment in the property; restrictions in the use of the property; and other equitable and economic considerations,  in assessing rental rates and lease lengths for use of airport property.

73.     The receipt of grant assurance funds also prohibits Defendant DOT-A from causing or permitting activity at the facility that would interfere with the use of airport property for airport purposes.

74.     Defendant DOT-A has permitted non-aeronautical activities at Kalaeloa Airport, as recently as September, 2017, which have interfered with the use of airport property for airport purposes, to the detriment of civil aviation users, including Plaintiff.

75.     Defendant DOT-A has violated conditions of the grant assurances received and allocated for use at Kalaeloa Airport, to the detriment of civil aviation users, including Plaintiff.

76.     Despite the availability and award of grants and other funds, Defendant DOT-A has failed to develop necessary plumbing, sewage, electrical and other infrastructure at Kalaeloa Airport for the benefit of GA users and in particular for  users seeking to construct private hangars for non-commercial purposes on pre-designated, undeveloped lots.

77.     In June, 2010, a Final Environmental Assessment (2010 EA)  for Kalaeloa Airport Development was prepared on behalf of the State of Hawai`i. The 2010 EA recognized an unmet need to provide hangars for storage of private-owned aircraft at Kalaeloa as well as other O`ahu-based airports.  The 2010 EA also recognized the need to provide space for lease lots to individuals for aviation-related uses.

78.     As of the 2010 EA, Kalaeloa Airport had no T-hangar structures or long-term lot leases available for private, non-commercial general aviation use.

79.     Prior to 2010, several potential leasees, including Plaintiff, contacted Defendant DOT-A for purposes of constructing private hangars for non-commercial general aviation use.  These efforts have continued into 2017, without the development or availability of any form of non-commercial long-term lease.

80.     Defendant DOT-A has repeatedly advised potential tenants interested in constructing private hangars at Kalaeloa Airport, that they would be required to

execute Defendant DOT-A only available long-term lease form, which Defendant DOT-A has conceded is designed for use by commercial users and contains terms and conditions which are not appropriate for non-commercial users, including a rent structure based upon a tenant's ability to recover the tenant's initial investment.

81.    Despite clear federal mandates requiring Defendant DOT-A to establish and publish uniform standards for the review and approval process related to long-term lease applications, and to publish standards for the assessment of reasonable rent values related to such leases, Defendant DOT-A has failed to develop these uniform standards.

82.    Despite Defendant DOT-A's knowledge that it is required to incorporate reasonable rental rate reductions into a standard rate structure for non-commercial users, considering various factors, Defendant DOT-A has failed to develop such a rate structure.

83.    As recently as June, 2017, general aviation organizations have reminded Defendant DOT-A of its obligation to provide these uniform standards and has Defendant DOT-A has failed to respond.

**Factual Allegations Relevant to Defendant DOT-A's Treatment of Plaintiff**

84.    Despite Defendant DOT-A's obligations to promote and nurture GA

activity at Kalaeloa Airport, Defendants have systematically engaged in conduct detrimental to this mandate, resulting in the effective extinguishment of non-commercial GA activity at Kalaeloa Airport.

85.     Plaintiff has been employed by the FAA as a aviation safety inspector, for more than nine (9) years and has personally been involved in non-commercial GA activity for more than thirty-eight (38) years.

86.     Plaintiff initially leased space from Defendant DOT-A, at Dillingham Airfield, for a period of approximately ten (10) years, before relocating to Kalaeloa Airport.

87.     Following initiation of the BRAC process, Plaintiff, in 2004, notified Defendant DOT-A of his request to obtain a long-term lease for an open and undeveloped lot at Kalaeloa Airport, upon which to construct a private hangar, for non-commercial aeronautical activity.

88.     In the interim, during this same time, Plaintiff became the first individual to rent a small, existing structure at Kalaeloa Airport, from Defendant DOT-A, which he used for a personal hobby, aircraft restoration.

89.     The availability of lease lots for purposes of long-term, non-commercial aeronautical use was specifically identified by Defendant DOT-A within the master plan submitted to the federal government as part of the BRAC

process and upon which Defendant DOT-A was granted a PBC.

90. At the time of Plaintiff's request for a long-term lease, Defendant DOT-A had no written standards, published or otherwise, establishing the process of obtaining a long-term lease for non-commercial aeronautical activity.

91. At the time of Plaintiff's request for a long-term lease, Defendant DOT-A had no published or other standards concerning available lot sizes, term of lease or financial requirements.

92. At the time of Plaintiff's request for a long-term lease, Defendant DOT-A did not have an available form of lease specific to non-commercial users.

93. At the time of Plaintiff's request for a long-term lease, Defendant DOT-A was required to comply with various FAA requirements establishing written and published standards for the acquisition of a non-commercial, long-term lease by interested GA users.

94. At the time of Plaintiff's request for a long-term lease, Defendant DOT-A was in violation of its obligation to have written and published standards for the acquisition of a non-commercial, long-term lease for GA users.

95. At the time of Plaintiff's request for a long-term lease, Defendant DOT-A did not have a lease application form specific for non-commercial aeronautical users.

96.     At the time of Plaintiff's request for a long-term lease, Defendant DOT-A did not have any published standards concerning the formulae to be used in determining a reasonable rate of rent for any long-term lease.

97.     In 2004, Plaintiff sought information concerning Defendant DOT-A's procedures and requirements for obtaining a non-commercial, long-term lease for construction of a private hangar.  As of this time, there were no such procedures or standards in place.

98.     In 2005, after months of prolonged discussions with Kalaeloa Airport Manager Bobby Ramos and Oahu District Airport Manager Ben Schlapak, Plaintiff was advised that Lot JRF 820 102 at Kalaeloa Airport was available for lease and had been reserved for Plaintiff.

99.     Lot JRF 820 120, measuring 100' x 100' was substantially larger than what had been requested by Plaintiff.  Plaintiff was advised by Defendant DOT-A that the lot sizes were based upon an airport master plan and that smaller lots would not be available to Plaintiff.

100.    In reliance upon representations of Defendant DOT-A, through Mr. Ramos and Mr. Schlapak, Plaintiff committed to the order of an 100' x 60' x 20' pre-engineered, steel-framed hangar.

101. Defendant DOT-A was aware of Plaintiff's reliance upon its representations, noted above, and was aware of Plaintiff's intent to order a pre-engineered hangar to be constructed on Lot JRF 820 120, prior to Plaintiff's placement of that order.

102. Defendant DOT-A was subsequently aware that Plaintiff had ordered and remitted initial payment for a pre-engineered, steel-framed hangar, to be erected on Lot JRF 820 120 at Kalaeloa Airport.

103. In furtherance of Defendant DOT-A's representations to Plaintiff, through Mr. Ramos and Mr. Schlapak, Plaintiff contacted Defendant DOT-A's property management office, and in particular Mr. Ethan Tomokiyo, advising of his intention to lease Lot JRF 820 120, for the construction of a private, non-commercial hanger, to be used as a general aviation workshop.

104. Mr. Schlapak provided Defendant DOT-A's property management office with written approval of Plaintiff's application for a long-term lease of Lot JRF 820 120.

105. Plaintiff was provided an application form, which he completed and submitted to Defendant DOT-A's property management office, in furtherance of leasing Lot JRF 820 120. The application form provided was designed for commercial leases and did not address non-commercial use.

24

106. At the time of Plaintiff's application, Defendant DOT-A had no application form available, which was specific to non-commercial aeronautical use.

107. Following submission of Plaintiff's application for lease of Lot JRF 820 120, Defendant DOT-A, through Property Manager Ethan Tomokiyo rejected Plaintiff's application on the basis that Plaintiff had failed to provide answers to certain application questions, seeking disclosures of Plaintiff's business activity and business finances.

108. Following the rejection of his application for a long-term lease, Plaintiff had several communications with Defendant DOT-A's Property Management officials, pointing out that the application form provided was intended for commercial users and reiterating that Plaintiff's intended use of Lot JRF 820 120 was for non-aeronautical purposes, such that questions concerning "business activities" and "business finances" were not appropriate.

109. After ultimately conceding that the application form was not designed for non-commercial users, Defendant DOT-A, through its Property Management Office, demanded that Plaintiff provide detailed personal financial information, in addition to tax returns already provided.

110. Plaintiff had already secured State tax clearances, had provided proof

25

of income and had otherwise established the ability to fully finance the addition of a concrete slab, the construction of a hangar and the cost of installing certain utilities.

111.  With regard to the installation of utilities, Defendant DOT-A had previously acknowledged that it was obligated to provide water and electrical service for its leased properties, but nonetheless would be requiring Plaintiff to bear this expense as a condition of any lease.

112.  Given Defendant DOT-A's insistence on further detail of Plaintiff's personal finances, Plaintiff repeatedly requested that Defendant DOT-A provide him with its written standards and requirements concerning personal financial disclosures, as concerns non-commercial aeronautical lease applicants.

113.  Defendant DOT-A ignored and otherwise failed to provide Plaintiff with any standards or requirements concerning disclosures of personal finances.

114.  As of the pendency of Plaintiff's application for the lease of Lot JRF 820 120, there were no written standards, procedures or protocols concerning the disclosure of personal finances to Defendant DOT-A, in conjunction with the review of an application for a non-commercial aeronautical lease.

115.  During the pendency of Plaintiff's application for the lease of Lot JRF 820 120, Defendant DOT-A's Property Management Office staff, withheld

approval of a lease, based upon random and unauthorized demands for further detail concerning Plaintiff's personal finances, by Defendant DOT-A's property management staff members.

116.   The demands by Defendant DOT-A's Property Management Office staff for additional details of Plaintiff's personal financial information, particularly in the absence of any written standard, procedure or protocol, was arbitrary, unduly invasive of Plaintiff's privacy and abusive.

117.   Defendant DOT-A's demands for arbitrary and extensive detail concerning Plaintiff's personal finances was discriminatory.  No other applicant for a non-commercial aeronautical use lease had been required to provide the same level of financial information being demanded of Plaintiff, prior to issuance of a lease.

118.   Defendant DOT-A was aware, during the pendency of Plaintiff's application for the lease of Lot JRF 820 120, that no other non-commercial aeronautical lease applicant, had been required to provide the same level of financial information being demanded of Plaintiff, prior to issuance of a lease.

119.   Knowing that Plaintiff had already made financial commitments towards the purchase and construction of a hangar at Kalaeloa Airport, Defendant DOT-A advised Plaintiff that a long-term lease for Lot JRF 820 120 would not be

issued unless Plaintiff provided whatever additional financial information was being requested, or may in the future be requested, by its Property Management Office staff members.

120.   Given the foregoing circumstance, Plaintiff sought the assistance of Kalaeloa Airport Manager Bobby Ramos and with Oahu District Manager Ben Schlapak to secure a lease.  Both stated they were unaware of any objective financial criteria used by Defendant DOT-A's Property Management Office staff, in evaluating a lease application.  Neither was aware of any legitimate or articulated concern by Defendant DOT-A's Property Management Office staff, regarding Plaintiff's financial ability to secure a non-commercial aeronautical lease at Kalaeloa Airport.

121.   After months of delay and at the suggestion and encouragement of Kalaeloa Airport Manager Bobby Ramos, Plaintiff submitted an application for a Revocable Permit (RP) to Defendant DOT-A, for the identical lot.  Mr. Ramos advised Plaintiff that the requirements to process an RP were far less onerous than for a long-term lease and that once an RP had been awarded to Plaintiff, the process to convert the RP into a long-term lease would be easier.

122.   Based upon Mr. Ramos' representations, Plaintiff sought and was provided an Application for Revocable Permit, by Defendant DOT-A's Property

28

Management Office, accompanied by a memorandum dated February 2, 2006 directing Plaintiff to execute the application and return it to the Property Management Office, together with a remittance of $1,825.00.  This amount was comprised of the first month's rent for Lot JRF 820 120 of $450.00, a security deposit of $1,350.00 and an administrative fee of $25.00.  The memorandum stated that the RP was subject to the approvals of the Oahu Airport District Manager and the Deputy Director of Airports.  No other requirements were stated.

123.   Plaintiff executed the Application for Revocable Permit and remitted the required amount of $1,350.00 to Defendant DOT-A on or about January 4, 2007.

124.   Plaintiff was told by Mr. Ramos and Mr. Schlapak that his application for an RP would be approved by them.

125.   Defendant DOT-A accepted Plaintiff's application for an RP and negotiated Plaintiff's payment of $1,350.00.

126.   Plaintiff subsequently issued full and final payment to the manufacturer of his hangar, and made arrangements for its shipping from Idaho to Hawaii.

127.   On or about March 3, 2006, Plaintiff received a phone call from Defendant DOT-A's Property Management Office, advising him that their office

29

had added a $30,000 "performance bond" requirement, as a condition of the RP. Plaintiff was advised that the bonding requirement was based upon an internal staff memo or manual and that the bond amount had been subjectively set by a staff member.

128.   On or about March 7, 2006, Defendant DOT-A, through its Property Management Office, gave written confirmation to Plaintiff of the bond requirement.

129.   On or about March 17, 2006, Plaintiff requested, through Mr. Schlapak, that Defendant DOT-A provide authority for the bond requirement as well as the criteria for determination of the bond amount.  Plaintiff also sought a representation from Defendant DOT-A as to whether the bond requirement had been imposed upon any other RP or lease recipient.

130.   As of March, 2006, there were no other RPs or long-term leases issued to non-commercial aeronautical users, for which bonds had been required.

131.   In or about June, 2006, Mr. Schlapak recommended a waiver of the bond requirement, indicating that Defendant DOT-A had waived bond requirements for other types of leases in the past.

132.   In or about June, 2006, Plaintiff made a formal request for a waiver from any bond requirement.

133. In or about June, 2006, Plaintiff also submitted additional proof of his financial resources to complete construction of his hangar, to Defendant DOT-A's Property Management Office, including tax return information, bank statements reflecting available funds, tax clearances, and additional documentation reflecting the hangar and related shipping costs had already been paid, in full.  Plaintiff also reminded Defendant DOT-A's Property Management Office staff that he had been a tenant at Dillingham Airfield and at Kalaeloa Airport for over ten years and that during that time his rental payments to Defendant DOT-A had been timely.

134. Given Defendant DOT-A's prior experience with Plaintiff as well as the financial information available, Defendant DOT-A was aware that Plaintiff was financially stable and able to complete the construction of his hangar and related work.

135. Plaintiff received shipment of his hangar from the manufacturer, at Kalaeloa Airport, on or about June 21, 2006, but was precluded by Defendant DOT-A from erecting the hangar on Lot JRF 820 120.  The hangar components, including large steel beams, remained stacked in an open and exposed area of the airport, pending issuance of either a long-term lease or RP.

136. The hangar components suffered damage while open and exposed to the elements, for several months.

137.    In October, 2006, Defendant DOT-A reiterated its requirement of a "performance bond".

138.    On or about January 4, 2007, Plaintiff signed an RP for the lease of Lot JRF 820 120, with attached Terms and Conditions.  Plaintiff was ultimately required to remit a cash payment of $10,000.00, in lieu of a performance bond, as a condition of the RP.  The cash payment of $10,000.00 was arbitrarily determined by Defendant DOT-A's property management office staff.

139.    Following issuance of an RP, Plaintiff completed the addition of a concrete foundation, construction his hangar and installation of water and electrical power, all at his cost.

140.    Since completion, Plaintiff's hangar has been utilized for non-commercial aeronautical use and in particular, for the restoration of general aviation aircraft.

141.    The cash payment of $10,000.00, made in lieu of a performance bond, remain in the possession and control of Defendant DOT-A, despite the completion of Plaintiff's hangar construction and utility improvements.

142.    After completion of the hangar, Plaintiff continued to express interest to Defendant DOT-A in obtaining a long-term lease for Lot JRF 820 120, with no progress.  These efforts continued through 2012 and into the summer of 2013,

32

with no success.

143.   Between 2006 and 2013, several other individuals sought to obtain non-commercial aeronautical leases at Kalaeloa Airport, from Defendant DOT-A, for the construction of private hangars, unsuccessfully.

144.   In 2013, Kalaeloa Airport had only four constructed hangars for non-commercial general aviation use, including Plaintiff's hangar.

145.   According to Defendant DOT-A's master plan, upon which the federal government agreed to convey the BPNAS airfield, Defendant DOT-A represented that it would develop the site to include at least 200 hangar lots for private, general aviation use.

146.   In 2013, a collective effort was made by several individuals ("GA users") to meet with Defendant DOT-A for purposes of addressing random and discriminatory practices by Defendant DOT-A in reviewing lease applications; developing published standards for lease applicants, generating an appropriate form of lease for non-commercial users and establishing transparent and appropriate rate structures.

147.   Defendants FUCHIGAMI, HIGASHI, SAKATA and LAREAU, acting under color of law and on behalf of Defendant DOT-A, attended and participated in these meetings.

33

148.   Defendants agreed to these meetings, in part, as a consequence of pressure from various State representatives, FAA representatives, AOPA representatives and others, concerning Defendant DOT-A's failure to develop and promote general aviation at Kalaeloa Airport.  Many of these representatives attended several of the initial meetings held, during which Defendants stated an interest in standardizing procedures, developing a non-commercial lease, developing appropriate standards for upon which rental rates would be based and promoting transparency.

149.   During the meetings between Defendants and GA users, Defendants stated their interest in working with GA users to facilitate the development and construction of private hangars at Kalaeloa Airport.

150.   At Defendants' insistence, limited representatives from this collective group (Kalaeloa Builders' Group), continued discussions with Defendant DOT-A on a near monthly basis.

151.   During the course of these meetings, Defendants were aware, by virtue of the federal government's conveyance of BPNAS to Defendant DOT-A as a public benefit, of Defendant DOT-A's obligation to provide long-term leases to non-commercial aeronautical users at Kalaeloa Airport, based upon reasonable terms and at reasonable rates, and without discrimination.

34

152. During the course of these meetings, Defendants repeatedly represented that they were in the process of generating a draft non-commercial lease. No such lease was ever generated by Defendants.

153. To facilitate the availability of a non-commercial aeronautical lease form, the Kalaeloa Builders' Group drafted and submitted its own proposed form of lease.

154. After approximately a year of discussions, Defendants determined that Defendant DOT-A would not adopt the proposed form of lease and would not develop its own non-commercial lease form.

155. Since these discussions were terminated, in January, 2014, Defendants have not published any standards for non-commercial long-term lease applicants.

156. Since the discussions were terminated in January, 2014, Defendants have not published any standards pertaining to the disclosure and extent of an applicant's financial condition.

157. As of 2017, Defendants continue to require execution of Defendant DOT-A's commercial form of lease for non-commercial users.

158. No further private hangars have been developed at Kalaeloa Airport, since 2013.

159. Of the 4 non-commercial hangars constructed at Kalaeloa, two have since been purchased and converted to commercial use. The tenant of a third hangar has indicated he will soon leave Kalaeloa Airport as well.

160. Despite the completion of all construction related to Plaintiff's private hangar, at a cost of approximately $250,000.00, and the timely payment of rent for the last ten years, Defendants continue to deny Plaintiff a long-term non-commercial lease for Lot JRF 820 120.

161. By letter dated August 25, 2017, Defendants advised Plaintiff of its intent to impose a rental increase for Lot JRF 820 120 from the current rate of $491.00, to $2,683.33, per month, effective October 1, 2017. The newly imposed rent represents an increase of over 500 %.

162. Since receiving the August 25, 2017 letters from Defendant DOT-A, Plaintiff has repeatedly requested that Defendant DOT-A provide information, including appraisal documentation, upon which the new rates are purportedly based. Defendant DOT-A has not provided this information.

163. Since receiving the August 25, 2017 letters from Defendant DOT-A, Plaintiff has requested that Defendant DOT-A provide information concerning the identity of any other tenants whose lot rent has increases by the same magnitude as Plaintiff's Lot JRF 820 120 rental increase. Defendant DOT-A has not provided

36

this information.

164.   Since receiving the August 25, 2017 letters from Defendant DOT-A, Plaintiff requested an extension of time within which to assess his options under the terms of the RP issued to him by Defendant DOT-A, due to the sudden financial hardship caused by Defendant DOT-A's rental rate increases.  This request was denied by Defendants.

165.   Given the economic and personal strains imposed by the rental increases, Plaintiff has considered the sale of his hanger and improvements to other potential tenants, each of whom are commercial users, but has been advised that Defendants will not allow such a sale.

166.   Plaintiff is unaware of any potential non-commercial GA user interested in the purchase or lease of his hangar and/or Lot JRF 820 120, given Defendant DOT-A's unreasonable and discriminatory practices towards non-commercial GA users and recent notice of rental rate increases for this lot.

167.   Under current circumstances, and given Plaintiff's economic situation, Defendants are forcing an abandonment of Plaintiff's hangar and improvements, to the sole benefit of Defendant DOT-A, and without any recourse short of court intervention.

## Count I

### 42 U.S.C. §1983 Violations

168.  Plaintiff incorporates by reference, as though stated herein, all of the foregoing averments contained within paragraphs 1 through 159, above.

169.  Defendants knew that their actions, as alleged above, were unreasonable, excessive and in direct violation of Plaintiff's clearly established constitutional right of equal protection as afforded by the United States Constitution.

170.  Defendants knew that their actions, as alleged above, were unreasonable, excessive and in direct violation of Plaintiff's clearly established constitutional right of due process.

171.  Defendants knew that their actions, as alleged above, were without justification and were unduly discriminatory towards Plaintiff and in clear violation of Plaintiff's constitutional rights.

172.  Defendants FUCHIGAMI, HIGASHI, SAKATA and LAREAU, at all times relevant herein and with respect to all actions alleged above, purported to being acting under color of State law.

173.  Defendants' actions, as alleged above, were in direct violation of 42 United State Code §1983.

174.  As a direct and proximately result of Defendants' actions, as alleged above, Plaintiff has been, and continued to be, substantially harmed.

175.  As a direct and proximately result of Defendants' actions, as alleged herein, Plaintiff has sustained substantial damages.

## Count II

### Breach of Contract - Intended Third Party Beneficiary

176.  Plaintiff incorporates by reference, as though stated herein, all of the foregoing averments contained within paragraphs 1 through 159, above.

177.  By operation of the instruments identified above, including the Quitclaim Deed by which John Rodgers airfield was conditionally conveyed to Defendant DOT-A, Plaintiff, as a civil aviation user, is an intended third party beneficiary of said Quitclaim Deed.

178.  By operation of agreements by and between the State of Hawaii, inclusive of Defendant DOT-A and other agencies, on the one hand; and U.S. Department of Defense and/or FAA, on the other hand, John Rodgers airfield was conveyed to the State of Hawaii as a public benefit conveyance, for which Defendant DOT-A assumed affirmative obligations to civil aviation users to maintain and operate Kalaeloa Airport for the equal benefit of all civil aviation users, including Plaintiff.

179.   Pursuant to the instruments and/or agreements referenced above, Defendant DOT-A assumed affirmative obligations to make land available at Kalaeloa Airport to individuals, including Plaintiff, engaged in non-commercial, aeronautical activities, and at reasonable terms and at reasonable rates.

180.   The affirmative obligations referenced above are mandated under federal law.

181.   The affirmative obligations referenced above are mandated under Hawaii law.

182.   Plaintiff is an intended third-party beneficiary as a consequence of the instruments and/or agreements referenced above, as well as by operation of federal and state law.

183.   Defendants repeatedly and without just cause, denied Plaintiff a long-term lease for use of undeveloped land at Kalaeloa Airport (Lot JRF 820 120), under reasonable terms and at reasonable rates.

184.   As a direct and proximate result of Defendants' actions, as alleged above, Plaintiff's rights as a third-party beneficiary have been, and continue to be, substantially harmed.

185. As a direct and proximately result of Defendants' actions, as alleged herein, Plaintiff has sustained substantial damages.

## Count III

### Negligent Misrepresentation

186. Plaintiff incorporates by reference, as though stated herein, all of the foregoing averments contained within paragraphs 1 through 159, above.

187. In reliance upon representations made to Plaintiff by Defendant DOT-A, by and through its Director and/or staff, Plaintiff committed to the purchase of a fabricated steel-framed hangar, to be constructed on leased space at Kalaeloa Airport.

188. Defendant DOT-A, by and through its Director and/or staff, was aware, that Plaintiff would be relying upon these representations, in purchasing a fabricated steel-framed hangar intended to be constructed on leased land at Kalaeloa Airport.

189. Plaintiff's reliance upon these representations was reasonable.

190. Defendant DOT-A, by and through its Director and/or staff, made initial representations to Plaintiff concerning the process necessary to acquire a long-term lease for the use of land at Kalaeloa Airport.

41

191.    Plaintiff reasonably relied upon these representations concerning the process necessary to acquire a long-term lease for the use of land at Kalaeloa Airport.

192.    Defendant DOT-A, by and through its Director and/or staff, was aware and otherwise expected, that Plaintiff would rely upon its representations concerning the process necessary to acquire a long-term lease for the use of land at Kalaeloa Airport.

193.    Plaintiff complied with and met all requirements of the process necessary to acquire a long-term lease for the use of land at Kalaeloa Airport, based upon representations by Defendant DOT-A, by and through its Director and/or staff, concerning the process.

194.    After fulfilling these requirements, Defendant DOT-A, by and through its Director and/or staff, changed the process for acquiring a long-term lease, including the addition of further financial and other requirements subjectively imposed by Defendant DOT-A property management officials and/or staff.

195.    Defendant DOT-A, by and through its Director and/or staff, and despite repeated requests by Plaintiff, failed to provide any standard, procedure or protocol in effect, justifying the additional financial and other requirements

demanded of Plaintiff.

196. By the time these new requirements were imposed, Plaintiff had already committed to the purchase of a pre-fabricated steel-framed hanger and had already invested in the cost of plans and specifications needed for the addition of a concrete slab upon which the hangar would be erected.

197. Defendant DOT-A, by and through its Director and/or staff, was aware of these financial commitments, at the time it imposed additional financial and other requirements for a long-term lease.

198. At the time of Plaintiff's application for a long-term lease, Defendant DOT-A did not have a lease form designed and available for non-commercial aviation use.

199. At the time of Plaintiff's application for a long-term lease, Defendant DOT-A did not advise Plaintiff that as a leasee, he would be subject to the same terms and conditions imposed upon commercial users, under the terms of the lease agreement.

200. In lieu of a long-term lease for Lot JRF 820 120, Plaintiff was ultimately issued a Revocable Permit, identified as 6535/007105, dated February 1, 2007, with an effective date of February 2, 2007, upon which to construct a private hangar for his non-commercial aeronautical use.

201.   In February, 2007, Defendant DOT-A's use of a revocable permit was not authorized or intended by the State of Hawaii to be used for tenants expected to construct private hangars, for long-term use.

202.   At the time the revocable permit was issued to Plaintiff, Defendant DOT-A, by and through its Director and/or staff, represented to Plaintiff that the revocable permit was temporary and would later be converted to a long-term lease.

203.   Defendant DOT-A was aware that Plaintiff was relying upon its representation that the revocable permit would eventually be converted to a long-term lease, at the time he applied for the revocable permit.

204.   Plaintiff complied with and met all requirements of the process necessary to acquire a revocable permit for the use of land at Kalaeloa Airport, based upon Defendant DOT-A's representations concerning the process.

205.   Defendant DOT-A negotiated Plaintiff's payments which accompanied his application for a revocable permit, which payments consisted of an administrative fee, a security deposition and first month's rent.

206.   Subsequent to completion of the process for a revocable permit and Defendant DOT-A's negotiation of all amounts requested, Defendant DOT-A, by and through its Director and/or staff, changed the process necessary for Plaintiff to

acquire a revocable permit, by demanding that Plaintiff also provide a $30,000 "performance bond" to Defendant DOT-A.

207. Defendant DOT-A, by and through its Director and/or staff, and despite repeated requests by Plaintiff, failed to provide any standard, procedure or protocol in effect, justifying the additional requirement of a "performance bond", much less for a value of $30,000.

208. Subsequently, Defendant DOT-A modified its demand for a $30,000 performance bond, to an additional $10,000 "security deposit.

209. Defendant DOT-A, by and through its Director and/or staff, and despite repeated requests by Plaintiff, failed to provide any standard, procedure or protocol in effect, justifying a second, additional security deposit, much less for a value of $10,000.

210. Under the circumstances, Plaintiff was required to remit the additional payment of $10,000 in order to secure the revocable permit necessary, to construct his private hangar.

211. Despite prior representations and repeated efforts by Plaintiff, Defendants have refused to issue Plaintiff a long-term lease for Lot JRF 820 120, upon which his private hangar has been constructed, with improvements.

45

212. Defendant DOT-A, by and through its Director and/or staff, was aware at the time of its representations to Plaintiff, that Plaintiff would reasonably rely upon the same.

213. Defendant DOT-A's representations, as described above, were false.

214. As a direct and proximate result of Defendants' misrepresentations, as alleged herein, Plaintiff has sustained substantial damages.

## Count IV

### Breach of Contract - Revocable Permit

215. Plaintiff incorporates by reference, as though stated herein, all of the foregoing averments contained within paragraphs 1 through 159, above.

216. Plaintiff was issued Revocable Permit 6535/007105 for the lease of undeveloped land at Kalaeloa Airport, at Lot JRF 820 120.

217. The terms and conditions of the revocable permit are subject to federal regulation concerning the leasing of land upon reasonable terms, at reasonable rates and absent discrimination, because Defendant DOT-A received Kalaeloa Airport pursuant to a PBC.

218. The terms and conditions of the revocable permit are subject to federal regulation concerning the leasing of airport lands upon reasonable terms, at reasonable rates and absent discrimination.

219.   Defendant DOT-A is aware of its obligation to Plaintiff, to lease Lot JFR 820 120 to Plaintiff upon reasonable terms, at reasonable rates and absent discrimination, in compliance with federal regulations requiring the same, and as a consequence of Defendant DOT-A's receipt of a PBC and receipt of grants and/or other funding from federally assisted programs.

220.   Despite the foregoing, Defendants have taken action to increase Plaintiff's monthly rent by over 500%.

221.   The increase in rent is not reasonable and is unjustified.

222.   The increase in rent is discriminatory to Plaintiff, as no other known tenant has been demand a comparable rental increase at Kalaeloa Airport, or elsewhere in the State of Hawaii airport system, particularly for non-commercial aeronautical activity.

223.   Despite Plaintiff's subsequent request for relief in various forms, including an extension of time before the rental increase becomes in effect and/or an opportunity to explore alternatives, such as the sale of his private hangar to a third party, Defendants refused all such relief.

224.   Defendants have breached the terms and conditions of the revocable permit to lease Lot JRF 820 120 to Plaintiff upon reasonable terms, at reasonable rates and absent discrimination.

225.   Defendant DOT-A is also obligated, by Hawaii law, to lease Lot JRF 820 120 to Plaintiff upon reasonable terms, at reasonable rates and absent discrimination.

226.   Defendants have breached Defendant DOT-A's obligations, under Hawaii law, as described above.

227.   As a proximate and direct result of the foregoing, Plaintiff has, and will continue to, suffer substantial damages.

## Count V

### Breach of the Covenant of Good Faith & Fair Dealing

228.   Plaintiff incorporates by reference, as though stated herein, all of the foregoing averments contained within paragraphs 1 through 219, above.

229.   Defendants were aware, at all times referenced above, that Defendant DOT-A had an obligation inherent in every lease, revocable permit and other contractual instrument, to exercise good faith and fair dealing.

230.   Defendants are in breach of Defendant DOT-A's duty of good faith and fair dealing, as owed to Plaintiff.

231.   As a direct and proximate result of Defendants' breach of the duty of good faith and fair dealing, Plaintiff has suffered substantial damages.

## Count VI

### Injunctive Relief

232. Plaintiff incorporates by reference, as though stated herein, all of the foregoing averments contained within paragraphs 1 through 221, above.

233. As a consequence of Defendant DOT-A's conduct, described above, including but not limited to Defendant DOT-A's notices of rent increases; refusal to delay the effective date of such rental increases; refusal to provide information upon which the rent increases are presumably based; and refusal to provide Plaintiff with reasonable options, Plaintiff will suffer immediate and irreparable harm, absent injunctive relief by this Court, as Plaintiff otherwise lacks an adequate remedy at law.

234. Based upon the foregoing, Plaintiff seeks and is entitled to, injunctive relief as prayed for below.

WHEREFORE, Plaintiff prays for judgment against Defendant DOT-A, as follows:

1. For an award of monetary damages sufficient to fully compensate Plaintiff for his injuries, in an amount to be determined at time of trial.

2. For a permanent injunction ordering Defendant DOT-A to timely adopt standards, policies and/or procedures consistent with federal and state

49

requirements to establish leases and/or agreements with reasonable terms and rates for the lease of airport lots to individuals engaged in non-commercial aeronautical activities at Kalaeloa Airport.

3.  For a permanent injunction precluding Defendant DOT-A from implementing rental increases and/or imposing other terms and conditions against Plaintiff pursuant to the existing Revocable Permit for use of JRF Lot 820 120, and requiring Defendant DOT-A to issue, consistent with adopted standards, policies and procedures to be adopted, an appropriate long-term lease for non-commercial aeronautical use of said lot, consistent with federal and state law.

4.  For reimbursement of all attorneys' fees and costs incurred in connection with Plaintiff's claims herein, and as allowed by law.

5.  For such further and additional relief as the Court deems appropriate and just in the premises.

DATED: Honolulu, Hawaii, September 27, 2017.

/s/Michele-Lynn E. Luke
MICHELE-LYNN E. LUKE, ESQ.
SAORI TAKAHASHI, ESQ.
BRADFORD CHUN, ESQ.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| TIMOTHY J. CISLO | ) | CIVIL NO. _____ |
| | ) | (Other Non Vehicle Tort) |
| Plaintiff, | ) | |
| | ) | **DEMAND FOR JURY** |
| vs. | ) | |
| | ) | |
| FORD N. FUCHIGAMI, in his official | ) | |
| capacities as Director, DOT, State of | ) | |
| Hawai`i and as former Deputy Director, | ) | |
| DOT-A, State of Hawai`i; ROSS M. | ) | |
| HIGASHI, in his official capacities as | ) | |
| Deputy Director - DOT-A, State of | ) | |
| Hawai`i and in his former capacities for | ) | |
| DOT-A, State of Hawai`i; ROY | ) | |
| SAKATA, in his official capacity as | ) | |
| the Airport District Manager for the | ) | |
| Oahu District Office of DOT-A, State | ) | |
| of Hawai`i and in his former official | ) | |
| capacities for DOT-A, State of | ) | |
| Hawai`i; ABIGAIL LAREAU, in her | ) | |
| official capacities for DOT-A for the | ) | |
| State of Hawaii, Property Management | ) | |
| Section; and DEPARTMENT OF | ) | |
| TRANSPORTATION - AIRPORTS | ) | |
| DIVISION, STATE OF HAWAII, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>DEMAND FOR JURY</u>**

Plaintiff TIMOTHY J. CISLO by and through his undersigned attorneys

hereby demands a trial by jury on all issues so triable.

DATED: Honolulu, Hawaii, September 27, 2017.

/s/Michele-Lynn E. Luke
MICHELE-LYNN E. LUKE, ESQ.
SAORI TAKAHASHI, ESQ.
BRADFORD CHUN, ESQ.

2